**Bernard R. LEE, Plaintiff,**

v.

**Margaret M. HECKLER, Secretary of Health and Human Services, Defendant.**

**No. L 83–13.**

United States District Court, N.D. Indiana, Hammond Division at Lafayette.

July 27, 1983.

Phillip Burchett, Lafayette, Ind., for plaintiff.

R. Lawrence Steele, U.S. Atty., Hammond, Ind., by Christina McKee, Asst. U.S. Atty., Fort Wayne, Ind., for defendant.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

Plaintiff, Bernard R. Lee, is an applicant for disability insurance benefits under Sec-

tions 216(i) and 223, respectively, of Title II of the Social Security Act as amended (42 U.S.C. §§ 416(i) and 423). Plaintiff filed his application for Title II disability benefits on May 12, 1981, alleging that he became disabled on April 13, 1980. The Secretary denied his application. Plaintiff requested reconsideration in a timely manner and said request for reconsideration was denied. Plaintiff requested an administrative hearing and a hearing was held at Indianapolis, Indiana on February 17, 1982. By decision dated March 29, 1982, the administrative law judge (ALJ) found that plaintiff became disabled on April 13, 1980 but that said disability ended on August 15, 1981. Plaintiff filed a timely request for review with the Appeals Council, requesting review of that part of the ALJ's decision which found that plaintiff's disability ended on August 15, 1981. The Appeals Council notified plaintiff by letter dated November 17, 1982 that the decision of the ALJ granting plaintiff disability benefits from April 13, 1980 to August 15, 1981 was going to be reversed. Plaintiff filed a response on November 24, 1982. By decision dated January 13, 1983, the Appeals Council denied plaintiff's request for benefits.

On March 2, 1983 plaintiff commenced this action against defendant. Defendant filed its answer to plaintiff's complaint on May 5, 1983. Plaintiff filed Motion for Summary Judgment June 7, 1983 and defendant filed same July 25, 1983. These cross-motions are now ripe for ruling.

To qualify for a period of disability and disability insurance benefits under Section 216(i) and 223 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age 65, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act. 42 U.S.C. §§ 416(i) and 423.

The issue for review before this court is whether or not a final decision of the Secretary is supported by substantial evidence.

This court is most impressed by the careful and thorough manner in which the ALJ handled this case. The decision of the ALJ is fully supported by the record and the law. After all, it is the ALJ here who saw and heard the witnesses and not the Appeals Council. The decision of the Appeals Council here is another example of a heavy handed attempt for it to engage in fact finding that properly belongs to the ALJ.

The facts surrounding plaintiff's claim for disability benefits under Title II of the Social Security Act are contained in the Transcript of the administrative hearing, numerous exhibits included with that transcript, and the pleadings in this cause on file with this court. The facts disclose the following:

Plaintiff, Bernard R. Lee, is a 53 year old man, having been born on April 30, 1930. He has a history of:

(1) Paget's disease (Tr. 139–141, 161);

(2) Spinal stenosis (Tr. 141, 161);

(3) Laminectomy and foraminotomy (Tr. 141–142, 150–151);

(4) Degenerative disc disease (Tr. 150–151); and

(5) Pain (Tr. 142, 144, 153, 193–195).

Plaintiff completed the 10th grade in school. He was in the military, and was sent to storekeeper school; however, he did not complete the training course due to lack of sufficient education to complete the course work. He has received no other schooling or training (Tr. 44).

Plaintiff last worked on April 13, 1980. At that time, he was employed by General Foods, Lafayette, Indiana, as a materials service handler in the warehouse. His duties required that he operate a forklift, load and unload trucks, stack and move product (Tr. 45). Plaintiff was frequently required to lift weight from thirty (30) to one hundred (100) pounds (Tr. 46).

When plaintiff was working as a truck driver, he had to load and unload his truck (Tr. 48, 51). His work as an extrusion press operator required that he lift weights from eighty (80) to ninety (90) pounds (Tr. 50).

The ALJ asked plaintiff to tell him why he stopped working. Plaintiff replied:

I know around 26 of March, I started having pains in my back. So I went to a chiropractor on the 27th. And he give (sic) me treatments. And he used an ultrasonic massager I guess you call it. And I went to him for till (sic) the 14th of April. My back wasn't (sic) seem like it was getting any better. I just thought I had pulled—strained the muscle or something. Working real hard. And so I went to my family doctor, and he put me in the hospital (Tr. 52).

Dr. Max Fields is plaintiff's family doctor, and he hospitalized plaintiff on April 15 (Tr. 52). Dr. Fields ran several tests on plaintiff and determined that he had Paget's disease (Tr. 52–53).

Plaintiff was then sent to Dr. Khairi, who is a specialist in Endocrinology (Tr. 53, 184). He admitted plaintiff to St. Vincent Hospital at Indianapolis, Indiana on May 21, 1980. Plaintiff underwent back surgery on June 2, 1980 (Tr. 53).

Following the back surgery, plaintiff obtained some relief from his pain. He did not, however, obtain complete pain relief (Tr. 54).

Plaintiff has been told that his Paget's disease is under control; however, he still experiences "a lot of pain" (Tr. 54), and he takes Phenoprofren 300 mg (4–6 pills daily) (Tr. 55), Parafon Forte (1–5 pills daily) (Tr. 57), and Elavil at bedtime (Tr. 58).

Plaintiff described his pain as being located in his low back, hips and legs, and right shoulder (Tr. 59). He states that he could sit for about one-half hour without too much discomfort. He states that the trip from his home to the hearing caused him discomfort, and he states that he was in pain during the hearing (Tr. 60).

When asked why he had stood up during the hearing, plaintiff states that the change in body position helped to relieve his pain (Tr. 60).

He does not sit while watching television. He lies on a couch as that seems to enable him to maintain a more relaxing posture (Tr. 60). If he sits for longer than thirty minutes, he has pain that feels like it's in his hips. He also has trouble standing on his right leg if he sits very long (Tr. 60–61). If he walks three to four city blocks, he has to favor his right leg. Sometimes, he cannot walk that far without experiencing pain. Bending over causes pain in his hips. Climbing stairs causes him pain (Tr. 62). Twisting his body causes him to experience back pain. Lifting causes pain in his back and hips (Tr. 63).

Plaintiff stated that he had tried to aid his wife in her job gathering eggs, but was unable to do more than pick up the eggs on one side of one cage before he had to stop because of pain in his back, hips, and right leg. The cage was about 75 feet long. This occurred even though he was on medication (Tr. 63). The pain was caused by the twisting and turning that was necessary to pick up the eggs and put them in trays (Tr. 64).

Plaintiff stated that he can drive his car for seven or eight miles. He testified that if he has taken a Parafon Forte capsule before he drives, he becomes drowsy and can't continue his driving (Tr. 64).

Plaintiff has no hobbies other than watching television. He said he had to give up his motorcycle because the vibration aggravated his condition. He sometimes needs help to get his socks on, and if he wears shoes with shoelaces, he has to have his wife or daughter tie them for him. He doesn't do any lawn mowing because he can't ride his riding mower because of the bouncing up and down (Tr. 65).

When plaintiff gets up in the morning, he has pain in his lower back. The morning of the hearing at Indianapolis, plaintiff stated that he had taken a Phenoprofan and a Parafon Forte capsule before the drive down to Indianapolis. He stated that both of these pain medications together did not give him complete relief, but the medications did lessen the pain's intensity (Tr. 66).

Plaintiff tries to assist his wife with the vacuuming, but he has had to stop doing it because the motion that vacuuming requires causes his pain to increase. He does help do laundry by putting the clothes in

the washer and dryer he has at home (Tr. 67).

By lying on his back on a couch when he watches television, plaintiff obtains some relief from his back pain (Tr. 67–68).

For about one week in December 1981, plaintiff could not leave his house. He had a cough, and the coughing caused his hips and lower back to hurt so much that he remained in bed (Tr. 68–69). He cannot get to sleep or remain asleep very long without taking Elavil. Otherwise, his pain will awaken him or keep him awake (Tr. 69).

Plaintiff testified that Vocational Rehabilitation Services had told him that he was ineligible for their services because he wasn't receiving Social Security disability benefits. He sought from General Foods, his employer, less strenuous work; however, due to the drowsiness caused by his medication, he was advised that they had no jobs for him (Tr. 70).

Virginia Lee, plaintiff's wife, testified that from her observations of plaintiff, his pain had not been abated by his surgery and other treatment. She testified that he would come to her place of employment for an hour or two because "it gets boring sitting in the house" (Tr. 71). She said:

A lot of nights he has been awake nearly all night long. He has kept me awake. And I know that he is in pain, because he thrashes about when he tries to sleep. And he never did that before he took ill. And he has always worked hard. And wouldn't stay home a lot of times when he should have (Tr. 72).

The diagnosis rendered by the Disability Determination Division on December 11, 1980 was: "Paget's Disease with Decompression Laminectomy, Degenerative Spondylitis, Post Laminectomy" (Tr. 82). The Disability Determination Division's diagnosis on June 19, 1981 was "Paget's Disease with lumbar stenosis" (Tr. 90). The same diagnosis was made on September 24, 1981 (Tr. 93).

A Social Security Administration claims representative, who assisted plaintiff, made the following observations:

He sat twisting an (sic) squirming on chair as if in pain. He walked like an old man—all bent over with arthritis which he does not have (Tr. 110).

On May 12, 1981, another claims representative observed plaintiff and reported that he "walks slowly w some difficulty" (Tr. 124).

In his report dated April 23, 1980, Dr. M. Rashid A. Khairi reported his examination and x-rays confirmed that plaintiff was afflicted with Paget's disease (Tr. 139–140).

Plaintiff was admitted to St. Vincent Hospital on May 21, 1980. Laboratory tests and clinical examination revealed:

* * * Lumbosacral spine showed minimal disc space narrowing. There was atherosclerosis of the iliac bifurcation. Numerous pelvic fecoliths were seen. Pelvic examination showed thickening and sclerosis of the left hilum including the iliac crest and slight thickening of the right iliac crest and sacro-iliac area. Pubic rami left showed reduplication of the cardia. These findings were compatible with Paget's disease. Lumbar myelogram showed markedly splayed at L4–5. There is an element of spinal stenosis and associated disc was not excluded. Tomogram of the lumbosacral spine showed a spinal stenosis (Tr. 141).

When treatment with Didronel, symptomatic analgesics, and muscle relaxants failed to improve plaintiff's condition, he underwent surgery at which time a decompressive laminectomy at L4 through S1 and foraminotomy at L4–5 and L5–S1 were performed (Tr. 141–143).

Following the surgery, Dr. Henry Feuer, the surgeon, wrote to plaintiff's family doctor, Max Fields, stating that the surgery appeared to have been successful in that a great deal of plaintiff's leg pain had been alleviated. Though plaintiff was still having trouble with his back and legs tiring out, Dr. Feuer was optimistic that plaintiff would be able to return to work sometime after the first week of September 1980 (Tr. 144).

On August 27, 1980, Dr. M. Rashid Khairi wrote to Dr. Fields that he had examined plaintiff on August 27, 1980, and that plaintiff complained of back pain. In fact, plaintiff reported that he felt his pain was worse than it had been in July 1980. Dr. Khairi advised plaintiff to continue off work for an additional two months to see if his condition improved (Tr. 145).

The doctor's hospital notes dated October 25, 1980, reveal that plaintiff was complaining of severe pain. Plaintiff reported that the pain was worse than it had been prior to his back surgery. Plaintiff reported that exertion caused pain, and that any movement caused his back to ache. Plaintiff also reported that his shoulders were "popping" (Tr. 147). Further investigation of his bone scan and physical therapy were recommended (Tr. 149).

On November 4, 1980, plaintiff was examined while he was again hospitalized at St. Vincent Hospital. He was complaining of pain in his back, across the hips, and down both legs. Dr. White took x-rays and performed a bone scan. The x-rays of the right shoulder revealed Paget's disease of the proximal humerus. The bone scan confirmed this. The x-rays of the spine revealed:

> ... degenerative disc space narrowing to a moderate degree at L5–S1 with advanced lower lumbar hypertrophic changes, postoperative laminectomies at L4 and 5, Paget's disease of pelvis, no significant hip joint change, possibly increased sclerosis from the Paget's compared to May 22 (Tr. 150).

Dr. White stated that plaintiff could be rehabilitated to a "certain level of function, although with his pathology, [he was] not certain if [plaintiff] will be able to return to frequent lifting". He recommended a progressive back exercise routine as treatment for plaintiff's back (Tr. 151).

Dr. Wheeler interpreted plaintiff's spinal x-rays taken on October 26, 1980, and reported:

> There is mild narrowing of the L5–S1 disc (sic) space. There is some marginal sclerosis. There are moderate to advanced hypertrophic spurs anteriorly at this level as well as at L4–L5 level. Minor spurring is present anteriorly at L3, L2 and L1 levels. * * * There are mild degenerative changes in the S1 joints noted (Tr. 152).
>
> In addition to the sclerotic margins of the S1 joints, we see mottle sclerotic pattern in the iliac wings bilaterally, somewhat greater on the left, extending downward into the superior pubic ramus on the left. These changes are due to Padgett's (sic) disease (Tr. 152).

On November 15, 1980, Dr. Khairi reported that plaintiff experienced joint pain and paravertebral muscle spasm. He states that there had been "some slight improvement" in plaintiff's condition following surgery. He recommended a brace and physical therapy. He estimated that 80% of plaintiff's "functional restoration" could be expected in 3–4 months, however, he could not give any date when plaintiff would be able to return to work (Tr. 156–157).

Dr. Max Fields, the treating physician, provided a letter to the Disability Division dated November 26, 1980. Dr. Fields reported that he had examined plaintiff on November 24, 1980, and found "the following to be true":

> Mr. Lee's main complication was growths in the low spinal tract which placed pressure on the nerve roots going into the legs. He had a corrective surgery, but continues to have severe pain when he stands up as long as 45 minutes or when he sits an equal length of time. He also has sharp pain going into the legs when he is sitting in a spine-fixed position and straightens up.
>
> He seems to have improved as far as the pain from the other parts of the Paget's Disease, due no doubt, to the chemotherapy that he has been taking.
>
> At the present time, he wears a back brace and is totally disabled as far as gainful occupation goes. He is taking physical therapy treatments, but at present, cannot see that they are helping (Tr. 158).

Dr. Khairi reported on February 18, 1981 that plaintiff was still experiencing pain in his lower back. He reported that plaintiff was "tender to deep pressure over the lumbosacral region and his straight leg raising was limited to 75 degrees bilaterally". Dr. Khairi stated his belief that plaintiff continued to have "symptoms of low back pain related to muscle spasm" (Tr. 159).

Dr. Frederick Robinson examined plaintiff on April 10, 1981, and after examining him, admitted him to St. Elizabeth Hospital, Lafayette, Indiana, for further evaluation. On April 14, 1981, plaintiff underwent a CAT scan of the pelvis. This study revealed "osteoarthritic change in the apophyseal joint areas at L5–S1 and L4–L5" (Tr. 165).

A CAT scan of the lumbosacral spine was conducted on April 16, 1981. This study revealed:

> There is calcium in the abdominal aorta, and there is significant osteoarthritic change in the apophyseal joint areas of L4–L5, and L5–S1, as was described. There is an increased density of bone with a variegated appearance adjacent to the sacroiliac joints, that in retrospect, is identifiable on the CAT scan. The exact etiology of this, however, is unclear. I would strongly suggest a bone scan for further evaluation, if osteomyelitis is a clinical consideration. This is a clinical decision. It may, however, be of help in further evaluation of the back pain. There is some osteoarthritic change scattered throughout the anterior elements of the lumbosacral spine, but no significant disc space narrowing is seen, except at L5–S1 (Tr. 166).

An electrocardiogram performed on April 13, 1981 revealed minimal non specific ST segment and T wave changes, and sinus rhythm (Tr. 167).

The discharge summary from Methodist Hospital dated June 8, 1981 reports that plaintiff had been admitted on May 31, 1981, due to complaints of pain in his back. Testing an examination revealed that plaintiff's knee jerks and right ankle reflex were absent. A myelography on June 1, 1981 revealed a "very slight indent on the right L5 root sleeve". The reporting doctor felt that this was insignificant. The doctor concluded that *if* plaintiff was to return to work, he would have to be on a weight lifting restriction. The discharge diagnosis was "post laminectomy pain syndrome (Tr. 170–172).

Dr. Donald Hardman performed the myelogram on June 1, 1981. He interpreted the x-rays that were taken of plaintiff's spine. His conclusion was that the myelogram showed "Possible recurrent herniated nucleus polposus at L4–5 on the right" (Tr. 174).

Results from an EKG examination done on June 2, 1981 suggested "possible inferior ischemia" (Tr. 175).

Dr. Khairi reported on July 8, 1981 that plaintiff was complaining of pain subsequent to lifting a weight of approximately 50 pounds. Dr. Khairi felt that the bulk of plaintiff's pain at that time stemmed from his "unstable back" (Tr. 178).

Dr. Feuer reported on August 15, 1981 that plaintiff's diagnosis was "chronic lumbosacral pain syndrome". He reported the absence of knee reflexes and the absence of reflex in plaintiff's right ankle. Pain and mild paravertebral muscle spasm was reported. He reported right arm pain thought to be secondary to Paget's disease. Dr. Feuer reported that plaintiff could stand and walk "2–4" hours out of eight. He reported that plaintiff could sit "2–4" hours in an eight-hour day. He stated that he felt plaintiff could return to work with a 20 pound weight-lifting restriction (Tr. 180–181).

The Disability Division's physician prepared a residual functional capacity evaluation based on a review of the medical reports prepared by other doctors. He suggested that plaintiff could walk and stand for six (6) hours and sit for eight (8) hours. He states that plaintiff can lift with both arms frequently, and that he can lift 10–20 pounds. He reports that plaintiff can reach above shoulder level, and that he can manipulate his hands. He states that plaintiff can climb steps or ladders, bend or stoop,

and use his feet for operating controls only "occasionally", and he is restricted from high places (Tr. 183).

Paget's disease of the bone is defined as: A disease of various bones of the body, especially of the long bones and the bones of the pelvis, i.e., the hip bones. There is a peculiar combination of loss of bone tissue and overgrowth of bone tissue, resulting in deformities. Another characteristic change is the transformation of the blood-forming marrow within the bones into a non-functional fibrous tissue. Schmidt's Attorney Dictionary of Medicine, Volume 2 (Tr. 187).

Paget's disease or osteitis deformans is a bone disease which causes both destruction and proliferation of bone. This disease process is often accompanied by various neurologic symptoms which tend to develop gradually. Although any part of the bony skeleton may be affected by this disease, the skull and vertebrae are particularly prone to be involved (Tr. 188). With skull involvement, cranial nerve symptoms predominate. However, with vertebral involvement, cord symptoms develop. Often the spinal canal becomes narrowed and/or diseased vertebrae collapse or fracture. With narrowing of the spinal canal, the neurologic cord symptoms develop slowly, while with collapse or fracture, their onset is rapid. The symptoms are those of cord compression with pain, weakness of the legs, incontinence and sensory disturbances. Courtroom Medicine, Volume 1B (Tr. 188). The etiology of Paget's disease is as yet unknown (Tr. 189).

In Paget's disease there is an excessive and abnormal bone remodeling. There is rapid resorption of bone during the course of the disease, with new bone formation also rapidly absorbed, resulting in irregular bone formation with structural abnormalities. Even during the quiescent stage, the bone remains sclerotic and functionally defective. Courtroom Medicine, Volume 7A (Tr. 190).

On May 23, 1982, plaintiff was admitted to Community Hospital at Indianapolis. He was complaining of pain. Dr. Khairi reports that none of the treatments provided to plaintiff since his Paget's disease was diagnosed in 1980 have relieved his pain. Dr. Khairi noted that in addition to the persistent back pain, plaintiff exhibited signs of anxiety and possible depression (Tr. 193–194).

Dr. Karl Manders provided a neurological consultation dated May 27, 1982. He reported that plaintiff definitely had Paget's disease and that involves the lower disc spaces. While Doctor Manders found no significant neurological defect, he reports that Patrick's test caused pain in plaintiff's right hip. He suggested adding transelectrical nerve stimulation along with the medication plaintiff was taking (Tr. 195).

Dr. Michael Yacko was consulted relative to plaintiff undergoing a caudal epidural block. Dr. Yacko advised plaintiff that his pain could be worse rather than better after the procedure. He notes that after pointing out to plaintiff the risks involved in undergoing such a procedure, plaintiff was given time to consider whether to take such a risk. No mention is made of plaintiff's decision (Tr. 196).

A discharge summary was prepared by Dr. Khairi on June 3, 1982. Dr. Khairi reported that plaintiff had been admitted to Community Hospital on May 23, 1982 for evaluation of his Paget's disease and treatment of back pain. "Bone scan showed increased activity in the proximal portion of the right humerus extending from the area of the humeral head to the end of the shaft about one third of the way." An EKG was read as being abnormal because of generalized nonspecific ST changes. Marginal osteoarthritis was found to be present in chest x-rays. MMPI test results showed functional overlay being responsible for some of plaintiff's pain symptoms. Plaintiff was given a trial on lumbar nerve route injection therapy, and he was given a trial on transcutaneous nerve stimulator without any significant response. Dr. Khairi's discharge diagnosis was: "1. Paget's disease of bone. 2. Back pain status post disc

surgery. 3. Type IV hyperlipidemia, and 4. Anxiety neurosis." (Tr. 197–198).

The ALJ found that plaintiff is closely approaching advanced age, that he has a limited education, and that his previous work experience has been unskilled (Tr. 22). He found that plaintiff was disabled as of April 13, 1980 because of *"severe exertional and non-exertional limitations* due to Paget's disease in his back" (Tr. 23) (emphasis added). He then found that plaintiff's disability ended on August 15, 1981, because plaintiff had regained the functional ability to perform light work. He held that Rule 202.10 of Appendix 2, 20 C.F.R. required a finding that plaintiff was "not disabled" (Tr. 23).

The Appeals Council reversed the ALJ's finding that plaintiff was disabled from April 13, 1980 through August 15, 1981. The Appeals Council ruled that plaintiff was not disabled at any time (Tr. 4–13). It is most revealing that the memorandum of the defendant Secretary filed here does not contain a single case citation.

The ALJ's specific findings, along with the uncontradicted testimony presented at the hearing established that plaintiff met all requirement for a period of disability and disability insurance benefits, except the disability requirement. The only questions presented with respect to these benefits is whether plaintiff is disabled as defined by Title II of the Social Security Act, as amended.

The statutory standard precludes the District Court, while reviewing Social Security disability benefit claims, from trying the case de novo, and if the Secretary's decision is supported by substantial evidence, the decision must be affirmed. *Tillman v. Weinberger,* 398 F.Supp. 1124 (N.D. Ind.1975).

The District Court, however, does have the duty to examine the entire record to determine if the Secretary's decision was supported by substantial evidence and to determine if any legal error was committed. *Kelly v. Weinberger,* 391 F.Supp. 1337 (D.C. Ind.1974); *Smith v. Weinberger,* 394 F.Supp. 1002 (D.C.Md.1975). "The Court's duty upon review is to examine the entire record to ascertain if the decision was supported by substantial evidence and a trial de novo is not proper." *Tillman v. Weinberger,* supra at 1127. This review must, of course, include consideration of that portion of the record opposed to the findings of the Secretary. *Dolan v. Celebrezze,* 381 F.2d 231 (2nd Cir.1967). Thus, if reliance has been placed upon one portion of the record and disregard of overwhelming evidence to the contrary, the court is bound to either modify or reverse the Secretary's decision. *Thomas v. Celebrezze,* 331 F.2d 541 (4th Cir.1964).

Substantial evidence sufficient to support administrative denial of a claim for Social Security disability benefits has become generally accepted to mean such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Walker v. Matthews,* 546 F.2d 814 (9th Cir. 1976). This standard has been described otherwise as more than a scintilla, *Kelly v. Weinberger, supra;* and somewhat less than a preponderance of the evidence, *Hess v. Secretary,* 497 F.2d 837 (3d Cir.1974); and if the trial were to a jury, to justify a refusal to direct a verdict. *Laws v. Celebrezze,* 368 F.2d 640 (4th Cir.1966). The substantial evidence standard, however, applies only as to conclusions regarding the facts relating to a particular claimant's characteristics, social, physical, emotional, and vocational; the standard does not apply to the Secretary's conclusions of law. The court is not bound by the Secretary's conclusions of law and has the authority to review both the validity of administrative provisions, and the interpretations given those provisions by administrative personnel. *Carroll v. Social Security Board,* 128 F.2d 876 (7th Cir. 1942); *Haxton v. Flemming,* 183 F.Supp. 2 (D.C.Cal.1960).

The evidence establishes that plaintiff's work history has consisted of medium to heavy unskilled work. In performing this work, plaintiff was required to lift weights ranging from thirty to one hundred pounds.

Medical evidence in the record states that plaintiff could not lift more than twenty pounds. The ALJ found that plaintiff could not do more than light work, and the Appeals Council found that plaintiff could not return to his previous work.

■ By establishing that he is physically impaired to the point where he can no longer perform his past relevant work, plaintiff established his disability prima facie. The burden then shifted to the Secretary to bring on substantial medical and vocational evidence to show that plaintiff could either return to his former work or perform other substantial gainful employment. *Stark v. Weinberger,* 497 F.2d 1092 (7th Cir.1974); *Whitney v. Schweiker,* 695 F.2d 784 (7th Cir.1982).

Dr. Max Fields, plaintiff's treating physician, diagnosed the presence of Paget's disease in plaintiff's back in April 1980. This diagnosis has been confirmed and reiterated by several other doctors who have examined and tested plaintiff. X-rays and other test results have revealed the presence of Paget's disease in plaintiff's low back, pelvis area, and right shoulder. The ALJ and Appeals Council found that plaintiff is afflicted with Paget's disease. There is therefore no doubt but that plaintiff has Paget's disease.

Dr. Fields stated his opinion on November 26, 1980 that plaintiff is totally disabled by the Paget's disease and concomitant pain. Dr. Fields reports that physical therapy, surgery, and chemotherapy have not rid plaintiff of his pain (Tr. 158).

Because of this pain, and difficulty standing and sitting for longer than 45 minutes, and since treatments have not significantly improved his pain, Dr. Fields expressed his opinion that plaintiff is totally disabled.

Dr. Feuer stated on June 2, 1982, that *if* plaintiff were to return to work, he would have to be on a weight lifting restriction. On August 15, 1981, Dr. Feuer stated that plaintiff could return to work if he were restricted to lifting no more than 20 pounds. However, in that same report, Dr. Feuer stated that plaintiff could only stand, walk, or sit 2–4 hours in an eight hour day.

Dr. Feuer wrote to Dr. Fields on July 10, 1980, after he performed surgery on plaintiff's back. He stated that plaintiff could not return to work before September 1980 due to the surgical procedure (Tr. 144).

Dr. Khairi, who along with Dr. Fields, has been following and treating plaintiff since the Paget's disease was diagnosed, wrote to Dr. Fields on August 27, 1980, stating that plaintiff was having back pain, and that he should continue off work for an additional two months (Tr. 145).

Medical reports prepared subsequent to August 27, 1980 reflect plaintiff's repeated visits to doctors and hospitals in his quest for relief from his pain.

However, none of the treating doctors, except Dr. Feuer, suggest that plaintiff can return to work with or without a weight restriction. Rather, their efforts have been concentrated on trying to alleviate plaintiff's pain.

The Disability Division doctor reports that plaintiff can engage in numerous activities (Tr. 183), however, this report was prepared by a doctor who never saw nor examined plaintiff. He rendered his decision based upon the records submitted by other doctors. This court takes a very dim view of that kind of so-called expert medical evidence.

■ It may be said that Dr. Feuer's reports contradict Dr. Fields' total disability diagnosis, however, it is suggested that such is not the case. Though Dr. Feuer states that plaintiff can return to work if he is restricted to lifting no more weight than 20 pounds, he also states that plaintiff can't sit, stand, or walk for more than 2–4 hours in an eight hour day.

Dr. Feuer appears to be suggesting that plaintiff can work part-time 2–4 hours daily with a 20 pound weight lifting restriction; not that plaintiff can work eight hours daily, five days weekly with a 20 pound weight restriction. However, Dr. Feuer's opinion does not seem to be shared by the other treating doctors' opinions.

This single equivocal opinion by Dr. Feuer does not therefore controvert the disability diagnosis made by Dr. Fields after following and treating plaintiff's condition over a long period of time. The Secretary did not question the credibility of Dr. Fields' opinion. Dr. Fields' opinion is therefore to be accorded controlling weight. *Whitney v. Schweiker,* 695 F.2d 784 (7th Cir.1982).

■ The opinion of the Disability Division's doctor, who never examined plaintiff, but based his opinion upon the reports of other doctors, deserves little weight in the overall evaluation of disability. *Carver v. Harris,* 634 F.2d 363 (7th Cir.1980).

"The expert opinions of plaintiff's treating physicians as to plaintiff's disability and inability to engage in any substantial gainful employment are binding upon the referee if not controverted by substantial evidence to the contrary." *Walker v. Gardner,* 266 F.Supp. 998, 1002 (S.D.Ind.1967).

■ The Secretary presented no substantial medical evidence to controvert the disability finding of Dr. Fields, the treating physician. The Secretary is therefore bound by that disability diagnosis.

■ Section 1.05(C)(1) and (2) sets forth the following criterion:

c. Other vertebrogenic disorders (e.g., herniated nucleus pulposis, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:

1. Pain, muscle spasm, and significant limitation of motion in the spine; AND

2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

The medical evidence of record establishes the existence of Paget's disease and its damage to plaintiff's spine, pelvic area, and right shoulder area. The medical evidence also shows that plaintiff has been afflicted with spinal stenosis (Tr. 141–143, 161). Plaintiff therefore has established that he has a vertebrogenic disorder within the meaning of Section 1.05(C).

Plaintiff has had several hospitalizations subsequent to the date he was diagnosed as having Paget's disease. He had surgery performed on his back in June 1980, and has been hospitalized on at least four separate occasions since that time. Each of the hospitalizations have been due to plaintiff's complaints of pain. This has occurred for more than one year.

Dr. Khairi reported on November 15, 1980 that plaintiff has joint pain and paravertebral muscle spasm (Tr. 156). On August 15, 1981, Dr. Feuer reported that reflexes were absent in both knees and the right ankle. He also reported pain and paravertebral muscle spasm (Tr. 180). Several of the doctors report that during their examinations, straight leg raising was limited to a range of 30° to 80° degrees (Tr. 139, 145, 159, 163, 178, 194).

■ The medical evidence establishes that plaintiff has no knee jerk in either of his knees, and the right ankle reflex is absent (Tr. 172, 180). Based upon the objective medical findings by the treating doctors, plaintiff's back condition equals the listing set forth at Section 1.05(C)(1) and (2).

■ The Listing of Impairments set forth at 20 CFR, Subpart P, Appendix 1, is to be used as a "guide to lay examiners to advise them when disability has unquestionably resulted, but the regulation cannot be construed to establish the exclusive means by which the showing can be made". *Lewis v. Weinberger,* 541 F.2d 417, 420 (4th Cir. 1976). It is sufficient if plaintiff's impairment is the medical equivalent of Section 1.05(C)(1) and (2). 20 CFR § 404.1516.

■ Plaintiff has shown by a preponderance of substantial medical evidence that his impairment is at least medically equivalent to the listing outlined at Section 1.05(C)(1) and (2), and he therefore should have been found disabled.

20 CFR § 404.1511(c) states that:

Light work entails lifting 20 pounds maximum with frequent lifting or carrying of

objects weighing up to 10 pounds. Even though the weight lifted may be only a negligible amount, *a job is in this category* when it requires *walking or standing to a significant degree, or when it involves sitting most of the time* with a degree of pushing and pulling of arm or leg controls. *To be considered capable of performing a full or wide range of light work, an individual must be capable of performing substantially all of the foregoing activities.* (emphasis added)

▋ The treating physician reported on November 26, 1980 that plaintiff was disabled due to the pain he suffers. He indicates that plaintiff cannot sit or stand for longer than 45 minutes without experiencing pain in his legs. Sitting in a spine-fixed position results in pain in his legs (Tr. 158).

Dr. Feuer took part in treating plaintiff. He reported his opinion that plaintiff could only sit for 2–4 hours during an eight hour day, and that he could only sit and walk 2–4 hours out of an eight hour day. Dr. Feuer reported the presence of right arm pain secondary to Paget's disease (Tr. 180–181).

Bone scans and x-rays have established that Paget's disease has infected plaintiff's right arm. Dr. Khairi reported on June 6, 1982 that a bone scan revealed "increased activity in the proximal portion of the right humerous extending from the area to the humeral head to the end of the shaft about one third of the way" (Tr. 197).

Plaintiff is right-handed (Tr. 40). He testified that he experiences pain in his right shoulder (Tr. 59–60). He testified that after sitting for longer than half an hour, he has low back pain. He stated that at home he does not sit in a chair, but lies on a couch. This gives him some relief from his pain (Tr. 60). After standing for thirty minutes to an hour, he has pain in his right leg, and it will collapse (Tr. 61). Walking causes his back to hurt. If he can walk without moving his upper body, he doesn't have as much difficulty (Tr. 62). Bending and stair-climbing cause him pain in his hips (Tr. 62). Lifting and twisting causes pain in his hips and back (Tr. 62–64). He has difficulty putting his shoes and socks on. If he wears shoes with laces, his wife or daughter has to tie them for him (Tr. 65). The Parafon Forte he takes makes him drowsy (Tr. 64).

The medical evidence reflects that plaintiff has paravertebral muscle spasms and that has restricted mobility in his back and right shoulder. Therefore, it is suggested that plaintiff cannot do light work as he cannot perform substantially all of the wide range of activities set forth at 20 CFR § 404.1511(c).

"A finding of capacity to do light work does not constitute evidence that a person can engage in substantial gainful activity, nor is such a finding sufficient to rebut a prima facie case of disability." *Hephner v. Mathews,* 574 F.2d 359, 362–363 (6th Cir. 1978); *Colyer v. Harris,* 519 F.Supp. 692, 695 (S.D.Ohio 1981).

"It is incumbent on the Secretary at a minimum, to come forward with specific findings showing that the claimant has the physical capacity to perform specified jobs, taking into consideration the requirements of the job as well as the claimant's age, education, and background. See *Smith v. Califano,* 592 F.2d 1235, 1236–37 (4th Cir. 1979); *O'Banner v. Secretary of HEW,* 587 F.2d 321, 323 (6th Cir.1978); *Bastien v. Califano,* 572 F.2d 908, 912–913 (2nd Cir.1978); *Lewis v. Weinberger,* 515 F.2d 584, 587 (5th Cir.1975); *Hernandez v. Weinberger,* 493 F.2d 1120, 1123 (1st Cir.1974); *Garrett v. Richardson,* 471 F.2d 598, 603–04 (8th Cir. 1972); *Meneses v. Secretary of HEW,* 442 F.2d 803, 806–09 (D.C.Cir.1971); and *Choratch v. Finch,* 438 F.2d 342 (3rd Cir.1971)." *Hall v. Secretary of HEW,* 602 F.2d 1372, 1377 (9th Cir.1979).

The Secretary's assertion that plaintiff can perform a "full range of light work" is not supported by substantial evidence.

▋ The ALJ found that plaintiff suffers from back pain, however, the ALJ felt that plaintiff's pain was not severe. This is based upon the ALJ's observations during the hearing, and reference to the medication that plaintiff was taking. The ALJ

also asserts that there is no objective clinical evidence of severe pain.

The Appeals Council, without ever seeing plaintiff, suggests that his pain is not severe. Like the ALJ, the Appeals Council made no finding that plaintiff was exaggerating or lying or that his testimony or that of his wife was inconsistent.

Plaintiff is taking Fenoprofen. The Physician's Desk Reference, 36 Ed. 1982 (hereafter PDR) states that Fenoprofen is an analgesic, and that it is used to treat mild to moderate pain. Pp. 880–881. The Parafon Forte that plaintiff is taking is used "as an adjunct to rest and physical therapy for the relief of discomfort associated with *acute, painful musculo-skeletal conditions.* PDR p. 1161 (emphasis added). In addition to the two pain medications, plaintiff is taking Dyazide for edema, and Elavil for the depression caused by his condition.

Testimony from plaintiff's wife corroborated plaintiff's claims of severe pain. Neither the ALJ nor the Appeals Council challenges her credibility.

The medical evidence of record reveals that plaintiff was hospitalized on several occasions due to his pain. Plaintiff testified that he spends most of his time lying down as that gives him some pain relief.

"It is well established that pain can cause disability within the meaning of the Social Security Act." *Benson v. Mathews,* 554 F.2d 860, 863 (8th Cir.1977).

"[S]ubjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence." *Marcus v. Califano,* 615 F.2d 23, 27 (2nd Cir.1979). "Subjective evidence of pain, therefore, must be accorded serious attention in the process of evaluating the total evidence." *Garcia v. Califano,* 463 F.Supp. 1098 (N.D.Ill.1979).

"There can be no doubt that symptoms real to the claimant though unaccompanied by objective medical data may support a claim for disability benefits." *Kelley v. Weinberger,* 391 F.Supp. 1337, 1341 (N.D. Ind.1974).

In this case, the ALJ did not conclude that plaintiff's testimony regarding his pain lacked credibility because his demeanor or inconsistent testimony suggested that he was lying or exaggerating. Instead, he relied upon his own observations of plaintiff's physical condition.

"An ALJ's lay opinion based solely on his own observations that a claimant does not exhibit outward signs of disabling pain is not substantial evidence sufficient to rebut uncontroverted testimony and medical evidence of disabling pain." *Garland v. Secretary of HEW,* 528 F.Supp. 415, 416 (E.D. Mich.1981). This is the "sit and squirm index" soundly criticized by Judge Warriner in *Tyler v. Weinberger,* 409 F.Supp. 776, 789 (E.D.Va.1976).

In this case, plaintiff's testimony and that of his wife relative to his pain is uncontradicted. Furthermore, their testimony is consistent with the objective medical evidence which documents that plaintiff has had back surgery and Paget's disease. The doctors report plaintiff's complaints of pain and the hospitalizations, therapy, and treatments that have been tried in their efforts to relieve his pain.

Though the doctors believe the Paget's disease to be in remission, they do not question plaintiff's claim of severe pain. Several doctors have reported paravertebral muscle spasms and loss of reflexes in both knees and the right ankle. They have also found limitations of motion ranging from 30° to 80° in his back.

In addition to these objective findings, Dr. Khairi, one of the treating physicians, states that plaintiff has an anxiety neurosis which has created a functional overlay that may be responsible for "some" of his pain (Tr. 197–198).

There is, in this case, in addition to plaintiff's and his wife's testimony, substantial objective medical evidence which supports plaintiff's claim and sets forth its cause: Paget's disease and the subsequent spinal surgery coupled with anxiety neurosis.

Since there is no controverting testimony or medical evidence to contradict the testi-

mony of plaintiff and his wife, and since their testimony is consistent with the objective clinical findings made by the treating physicians, the Secretary's discounting of plaintiff's claim of severe pain lacks the support of substantial evidence. *Garland v. Secretary of HEW, supra.*

■ Plaintiff has the initial burden of showing that he suffers from a medically determinable impairment and that he is unable to engage in substantial gainful employment. *Whitney v. Schweiker, supra.* However, "in sustaining that burden [he] is entitled to have the medical evidence presented to the examiner viewed by him and this court in a light most favorable to [him]". *Labee v. Cohen,* 408 F.2d 998, 1000 (5th Cir.1969); *Selewich v. Finch,* 312 F.Supp. 191, 195 (D.Mass.1969).

■ Since the broad purposes of the Social Security Act are to be liberally construed in favor of disability when such is reasonably made out, *Bagwell v. Celebrezze,* 232 F.Supp. 989 (W.D.S.C.1964), and since the intent is inclusion rather than exclusion, *Miles v. Celebrezze,* 233 F.Supp. 767 (W.D.S.C.1964); *Drafts v. Celebrezze,* 240 F.Supp. 535 (E.D.S.C.1965), plaintiff has carried his burden and established not only that he cannot do his former work, but that he cannot do any other work which exists in the national economy.

The Secretary's decision is not supported by substantial evidence. The plaintiff's Motion for Summary Judgment is GRANTED. The defendants Motion for Summary Judgment is DENIED. Judgment shall enter accordingly.